Good afternoon and may it please the Court. My name is Sean Malone here on behalf of plaintiffs' appellants. I'd like to reserve five minutes for rebuttal and I'll keep an eye on that. Just to provide some context to the Court this morning, Cottonwood Timber Sale is located in Southern Oregon in the Ashland Resource Area. It's located in one of the most botanically diverse watersheds in the state of Oregon, that's the Jenny Creek Watershed, also in close proximity to the Cascade-Siskiyou National Monument, which has been set aside for its unique and complex biological and geographic intersection. We have northern spotted owl habitat in the project area. We have Pacific fishers detected in the project area, which is significant. The project would log 725 acres, all of which would be either nesting, roosting, foraging, or dispersal habitat. Do we know that these fishers are living on this parcel, this property we're involved in? So there's the project area, which is a smaller area, and there's the analysis area. And it's my understanding that they've been, multiple fishers have been detected within the analysis area as they're not collared or anything like that. So they may very well be in the project. How big is the analysis area? I believe the analysis area is about 12,000 acres, and I believe the project area is roughly 1,200 acres. And counsel can correct me if I'm wrong on that. And in the project area, do we just have the one fisher sighting? It's my understanding that the BLM used the plural. I believe they said fishers, so there'd be more than one. In the project area? Oh, in the project area. I believe they set up cameras in areas, and that detects the fishing. I believe that camera is located in the broader analysis area. So I think it's sort of assumed that if they're in this analysis area, it's very likely that they're also in the, they could be in the project area. Because they have immense home ranges, 20 miles, 20 square miles, I think 36 square miles for some of the males. What's your understanding of the reason as to why BLM rejected the no-road alternative? The no-roads alternative. My understanding of that, well, first of all, plaintiffs presented that alternative because there's a high density of roads already in the Jenny Creek watershed. There's been significant accumulation of sediment as a result of clear-cutting since the 1950s. Roughly 50 percent of the Jenny Creek watershed has been clear-cut since the 1950s, and over 99 percent of the perennial streams are not functioning properly in the Jenny Creek watershed. So naturally, a reasonable... Counsel, could you answer Judge Murphy's question? Sure. Yes. Thank you. So my understanding is that the BLM rejected that alternative because the road that would lead to two or three units would not be constructed. Then it would be required that helicopter logging would have to take place, and helicopter logging is more expensive. And then as a result of that increased expense, they would have to drop those three units. I guess I'm trying to understand your argument why it's arbitrary and capricious. Sure. And so after the BLM issued their decision record, their final decision, they... Excuse me. I didn't finish entirely before. So their rationale for rejecting it was that that was uneconomical and unsustainable. And then after their decision record, the BLM then dropped over 10 units and 383 acres. And plaintiff's alternative would have required dropping three units and 127 acres. So the rationale that the BLM used, uneconomical, unsustainable, would apply to their very own final alternative more so. Well, that assumes that those acres are all fungible, Counsel, right? The project purpose... There are several purposes to this project, and they're identified. And one of them has to do with forest production, but one of them has to do with maintaining the structure for nesting, roosting, foraging. I'm sure you're going to agree that there were several purposes. Sure. Right. So my problem with the argument you're making now is that it seems to presuppose that these, that all of the acres were fungible, rather than some of them being, you know, perhaps higher yield of timber, some of them perhaps having greater fuel load and needing to be taken out, you know, more than other acres. And I just don't know that we have the record for that. Sure. I can understand that. I think one of the crucial points is that you talked about the project's purposes and needs. And one of those purposes and needs is to maintain a transportation system. Right. And first of all, in these record review APA cases, we look at the rationale that the BLM has. And we look at the rationale about being uneconomical and unsustainable. And subsequently, during the briefing, the BLM and the interveners have raised this issue, oh, well, there's this project purpose and need that requires us to maintain a transportation system. That was not a specific rationale provided by the BLM. So in essence, that's a post hoc rationalization that shouldn't be considered by the Court. Only the rationale on 290 to 291 of the excerpts of record should be considered. And that's the uneconomical basis and the unsustainable basis. So they gave an explanation in a different section than for what perhaps we are arguing they should have if they really meant it. Is that what you're saying? Sure. I mean, it's just simply to maintain the transportation system is just a purpose and need. They never argued that that specifically was a reason to eliminate plaintiff's alternative. And let's say they offer that now. I mean, is that fatal to the plan? And if so, why? It's a very good question, Judge Mardia. And it is not fatal. And the reason for that is, is because the project also reconstructs and maintains 36 miles of roads within the project area. Those roads that are used to transport timber in and out of the vehicles and timber in and out of the project area. So maintaining and reconstructing and improving these roads, that would maintain the transportation system. So that project purpose and need is still satisfied with plaintiff's alternative. Was the plaintiff's no-road alternative no new roads? Correct. Okay. So you're going to use the existing. It's actually really hard to find that answer in the briefing. I spent some, quite some time looking for it. So I just want to make sure that the Soda Mountains alternative was no new roads. Use the existing roads. And then as to these three units that had been in the original proposal that you couldn't get to by road, you wanted to use helicopters. Yes? Plaintiffs would not seek to use helicopters. They would just prefer – well, the BLM said we wouldn't use helicopters because it would be too expensive. So we would just drop them. So I think that would be plaintiff's rationale. Okay. So Soda Mountains' notion was to just use the existing roads. When you say no roads, you mean no new roads. That is correct. And that would have meant that those three units would not have been accessible. Exactly. Okay. Do we know anything about those three units, two of which made the final cut – pardon the pun – in terms of the characteristics that may have made them, as I said, not fungible vis-a-vis the other units? The unique nature of those two or three units, BLM's rationale doesn't explain anything beyond the economic aspect of it or the, quote, unquote, unsustainable aspect of not logging that. Okay. Well, so if you succeed on the no new roads issue, where does that come from, if you I'm sorry. I didn't catch the last part of that question. I have that question, too. To my clients, Your Honor, it's a significant deal because, as I said, 99.4 percent of the perennial streams in the Jenny Creek Watershed are not properly functioning, 50 percent of it's been clear-cut. But what does that mean for this case, I mean, for purposes of this litigation? Let's say you're successful on the no new roads. I know there's a district court proceeding going on right now. I mean, I think it's nearing the end of the briefing for that. Is that correct? That is correct, Your Honor. The magistrate judge has issued his findings and recommendations. That's on the permanent injunction that's being litigated. That's actually on the summary – yes, yes. Summary judgment on the permanent injunction. This is – because you're on here on appeal on the preliminary injunction, correct? That's correct. Okay. And so, just trying to figure out, if you're successful here on the no new roads, wouldn't we wait for the permanent injunction to be decided before we make any decision here? Or what does that mean? And if you are successful on the no new roads, either down in the district court or up here, does that mean this goes back for further evaluation for the BLM to take a harder look at the no new roads alternative? I think the – for the roads issue specifically, not looking at the other ones, it would require the BLM to look at an alternative and to vet that alternative against the other alternatives. Would it hold up the whole project? If this court – the project right now is being held up because the motions panel did enjoin the project pending appeal, and I think an injunction issuing from this court here would hold up the project. But just on the no new roads, I'm trying to figure out, if you could just help me in practical terms, what that means, because I'm not sure I understand based on the briefing. Sure. I think in practical terms, it would probably hold up the three units that the new road would probably lead to. Until there's a further – until BLM examines that further, and then they would proceed with the rest of the project? Or would the whole thing be held up? Potentially. Assuming the other claims aren't successful and the roads claim was successful, I think the units that the road leads to, those would be held up, and the remaining part of the project potentially could not be held up. I'm not sure how the district judge would fashion a preliminary injunction. Counsel, did you ever argue no action? I recognize that your clients proposed an alternative proposal, but did you argue that nothing should be done? Well, under NEPA, no action alternative is required. I don't think my – Did you advocate for that? I don't believe my clients argued that in the administrative process. The reason I'm asking – it's not a trick question. You know, we're trying to get our arms around this. And the BLM's brief argues that this is an unhealthy forest predisposed to high severity fire due to a number of things – overly dense stands, insect infestation, and so forth. And what I'm trying to get at is whether or not Soda Mountain disputes that or is it your client's position that this needs maintenance, essentially, but that you think it should be done a different way? I think it's never a clear issue when an agency sets out to do a large project that has many components. I'm sure my clients would be willing to concede that some aspects of it are perhaps beneficial. But on the whole, in this case, my clients would be opposed to it. Well, opposed certainly to the original proposal, which isn't even on the table anymore. And in fairness, when your clients suggested their alternative proposal, it was just the original proposal on the table. Now there's this 725-acre record decision to be sure. But I just wanted to clarify that your clients never advocated the no-action proposal. Not to my knowledge. Thank you. I guess back to my no-roads question. Is there any case of which you're aware of or that this Court has found that an agency rejected a proposed alternative for a reason that we found arbitrary and capricious? Not off the top of my head. On rebuttal, I might be able to come back with something for you, Your Honor. So... Perhaps I misunderstood the question. Assuming, let's just think that if BLM somehow, or that's hypothetical, assuming arguendo, improperly rejected the no-road alternative, can you prevail even if the agency reached a reasonable result despite this error? I understand your question now. The case law has held that an unanalyzed reasonable alternative is fatal to an alternative's analysis, and hence the project itself. A particular Idaho Conservation League, V. Muma, 956 F. Second, 1508, 9th Circuit, 1992, quote, excuse me, this is from Citizens for Better Henderson v. Hodel. This is on page 49 of our opening brief. The existence of a viable but unexamined alternative renders the NEPA document inadequate. And I'm aware of that. But BLM, I think, cites to the language in Earth Island, suggesting that because there was no significant impact, it was not obligated to consider the no-road alternative. I mean, what's your response to that? Because that seems to be in tension with the case that you just cited. Okay. The more recent Earth Island case is what you're referring to, I believe. And that would assume that a project could not be struck down for an alternative's analysis alone. It seems to me that's what they're arguing. Case law differs on that with regard to any alternative's claim that has been, any alternative's challenge that has been upheld by plaintiffs. I believe California Block, Center for Biological Diversity v. National Highway Traffic Safety Administration, from this Court in 2008, I believe, is also one of those. Hopefully I've addressed that question.  In just plain English, if it's decided that your client is successful on what you call a no-roads alternative, where does that leave the project? If my clients were only successful on the no-roads, no-new-roads alternative, then I believe the remainder part of the project would go forward and the two or three units that that road would have led to would be enjoined from timber cutting. But that seems inconsistent with what you just said, that it was fatal because of the procedure. And that's what I'm trying to figure out. Sure. So essentially, if you find a flaw or a violation of NEPA or FLPMA, I guess the question you're getting at is, do we enjoin the whole project or do we enjoin this small portion of the project? What's FLPMA? That would be the federal... It's acronyms. That would be the federal... You can compose a whole sentence. It's only with acronyms. I'll give you a prize. Judge Pregerson, FLPMA would be the Federal Land Policy and Management Act. It's kind of like the National Forest Management Act for the BLM. Give me the rest of them. You got 10 more? I could probably try and do it. But I think the issue you're getting at is the, how do we narrowly tailor an injunction, a preliminary injunction? That's an issue that was raised in Lance Counsel v. McNair, and it is a legitimate issue. And I think counsel would discuss that or the district court judge, seeing his discretion, would be able to narrowly tailor an injunction based on whatever claims we would succeed on. Because the no-road alternative argument you're making really only pertains to originally there were three, and now one of them was excluded anyway. Correct. Just the other two, 20-1 and 20-2? Yes, exactly. So those particular units, I think, under the hypothetical that you're posing... What effect would that have on the whole project? So just a small portion of the project, I think 20-1, 20-2 would be enjoined. The remainder of the project could potentially go forward. I think it's really... But what's the overall effect? A couple of units aren't logged. I guess I'm just not understanding the question. Well, why did you seem happy with the no-road alternative? You see, one of the problems I have, and I was on those spotted owl cases, was it was hard to get a clear answer. I remember reading about, here's a habitat, here's a habitat, and what we want is a pathway from one to the other. Sure, a corridor. A corridor, yeah. So corridor, to me, means kind of a narrow road. But it turns out corridor means the whole forest. You see? So I think most of us that were listening at that time thought the corridor meant a narrow road. Then we found out it was the whole forest. So I'm trying to find out what the consequences of the no-road alternative, as you label it, would be. Okay. So if the... Would it stop everything? Or is that going to take care of the problems with the watershed that you talked about? Sure. I think it would begin to help the watershed to recover to the extent that there wouldn't be any roads. And perhaps one thing that I'm not talking about initially is that roads contribute significant sediment to waterways, and that's why... Well, we know that. But they also allow the forest to be thinned, and there's a significant fuel load in this forest. And I haven't heard your client dispute that anywhere. So this is a balancing act, and we're just judges. Correct. We don't know a lot about forests, although I love forests. I spend a lot of time in them. But I'm sure we all value them. And I'm just trying to make the point that to say that a road is inherently bad isn't helpful to me because these logging roads are inherently necessary to manage the forest, certainly to abide by the congressional directive that these forests, this timber, be harvested for economic reasons, which is another project goal, and in this case one that has to be, I think by law, prioritized. So, you know, that's difficult for me, and it goes back to the problem I have with not knowing anything about which units. I'm confident that they're not all the same in terms of habitat and timber. And if I may, I would point you to the declarations in the record, the declaration of Dave Willis, the declaration of Jay Leininger. They specifically talk about 20-1, 20-2, the unique characteristics of that. But those are unhelpful, counsel, because you're using a different definition for old growth, for example. You're not using the BLM's definition. You're just using a different one without directly highlighting that you dispute the definition. So that's a big problem I have with those declarations. Okay. I understand. But there are photos attached to at least the Leininger declaration of 20-1, 20-2. So Your Honor may have a look. I believe we put them in the excerpts of the record. I've seen them, yes. And I believe they're in color, too. But the plaintiffs do my understanding of the record is that that is the only evidence in the record demonstrating the unique nature of 20-1, 20-2, those particular units that the road would lead to. And I would encourage you to look at those. They describe more than just old growth. Well, you bet. They do. And in fairness, I didn't mean to suggest otherwise. But to go back to I think it was Judge Murgia's point, we're here reviewing a motion for preliminary junction, specifically an order denying one. And the kinds of more granular questions that I'm asking and probably ought not be asking really go to decisions made by a trial court. Correct. Why would we second-guess that here? Well, I think to the extent that the trial court didn't have a ---- the administrative record in this case was produced a day before, roughly 25,000 pages before a plaintiff's move for preliminary injunction on an expedited briefing schedule. So to the extent that the trial court judge had a more significant, greater understanding of these particular units, that may not be the case. Okay. But preliminary junctions are strange animals. And what you just described happens a lot in this type of proceeding because it's a preliminary injunction, right, because it's done on an expedited basis. Nevertheless, we have rules about the standard of review for this type of proceeding. And the trial court judge was much closer to the evidence. Correct. Made the determination that you all didn't meet your burden at that stage. And as Judge Merguia noted, there's a summary judgment motion and a ruling that's coming our way. That's correct. One would think. And why we ---- it just seems to me terribly important that we confine ourselves to the question that's really in front of us, and that is, why was it an abuse of discretion for the district court judge to rule the way it ruled? With regard to just the Rhodes alternative or other issues? No Rhodes alternative, the NEPA claim is what I'm most interested in. Why was that an abuse of discretion for him to decide that the BLM was not arbitrary and capricious? I think plaintiffs would take the position that the rationale, uneconomical, unsustainable, provided by the BLM, simply does not play out when the BLM actually endorsed or their final alternative that they chose was one that was more uneconomical, more unsustainable than plaintiff's alternative. Well, it was ---- it yielded, the 725-acre record decision would have yielded less timber, to be sure, I would think. Correct. I mean, 725 acres, and assuming that they're at least reasonably comparable. Sure. That would certainly be the case. But when you say less economical, that strikes me as incorrect, because your proposal, the 981-acre proposal, was a smaller area, the no Rhodes, the no new Rhodes alternative, but you had this problem with the three areas that were going to have to be harvested by helicopter. Those three areas were included in your client's proposal, right? They were not. So the three areas, oh, forgive me, the three areas we're talking about were included in this book, were included in the BLM's original proposal. In the final. And then, well, one of them was excluded from the final, right? Yes, correct. Okay. So we're on the same page now. All right. So your problem with, it seems to me, on the no Rhodes alternative, what I'm hearing you say is that your strongest NEPA argument is that the reason they gave, if we look just at the one page you've asked us to look at in the record, which is, well, 290, 291. Yeah, it's on both, yeah. Two pages, that that said that it's uneconomical because of the helicopter yarding that would be required. But they then said that they would have to drop those units. It didn't just end up being very expensive. They said they would then have to drop the units. Right. And they, in fact, did drop one of them. Correct. And so what you're arguing now is a proposal that you didn't argue below, necessarily. There's no way, because the final, plaintiffs don't have any say after they choose their final decision, so there's no way we could have. Is there a mechanism that brings me to another question? If they had come out with a proposal that was really different, would there be a mechanism that would trigger another public comment where you would have had an opportunity to comment on the 725? I believe that's on point with the California v. Block case, and that's not. So you're not arguing that you should have had that opportunity here, that they triggered that? We have not argued that, Your Honor. Thank you. Let me ask you this, just so I got this straight. Now, this is on the no-road alternative, and the BLM explained that it rejected the no-roads alternative because it would be too costly, right? And specifically, the BLM explained that without new roads, it would have to forego logging three units of land that comprised about 11 percent of the project. Are you listening to me? Yes, Your Honor. Okay. As initially proposed, because those units would have to be accessed by helicopter, that's 11 percent. Is that right? Correct. Okay. But the BLM ultimately decided not to log on 34 percent of the initially proposed project. I think generally that is correct, yes. Okay. I just want to make sure I'm on the right corridor. Yes, Your Honor. The BLM's final decision dropped about roughly 30 percent of the project. Okay. And so the decision to log even fewer units than Soda Mountain's no-roads alternative makes the BLM's rejection of the alternative as too costly. It makes that position of the BLM seem arbitrary and capricious. And therefore, a violation of NEPA. Correct. I think plaintiff's biggest problem with what occurred is that oftentimes they will submit alternatives, reasonable alternatives in the administrative process, and most frequently they're dismissed outright. And what it seems like in this particular case is that the notion that it was uneconomical, the notion that it was unsustainable, was simply a pretense to dismiss plaintiff's alternative. And the evidence for that is that the BLM actually finally decided on an alternative that apparently was also uneconomical and unsustainable as that rationale plays out with plaintiff's alternative. And I understand Judge Kristen might disagree on that. So, all right. Except it could also be viewed as a response that's very responsive to your proposal. And it could also be viewed that the NEPA process, which is designed to generate public comment and feedback, worked here. Because after all, they went from 1,108 acres to 725 acres, and they did reduce the amount of new roads. So, one can look at this and think, hey, the process is really working. I can see how that could be taken, Your Honor. There were other commenters in this case, other parties that were taking part in the administrative process commenting. And the roads that, or excuse me, the units that were deferred or dropped by the BLM, with the exception of that single one, all of the others were, had nothing to do with my client's comments. As far as I understand it, and as far as the record demonstrates, I haven't seen, throughout the briefing, I haven't seen interveners or defendants state that this was responsive to my client's alternatives. And beyond that, my client's alternative was unanalyzed. And the road was not. And I'm not sure if you're concerned about the mistletoe infestation, and your client's concerned about the Pacific Fisher, and your client's certainly concerned about the roads because of the watershed issue. Correct. And all of this, where they wound up, and the record decision seems to me to have less impact in all of those areas. Is that a fair understanding of the record? As to whether it will have less of an impact on, I think generally there's less logging units, so you could perhaps come to that conclusion. I think a lot of the units that were dropped by the BLM after the decision record had to do with the Pacific Crest National Trail that snakes through the area. And whether those specific units were better fisher habitat or northern spotted owl habitat or contained greater amounts of mistletoe, the record doesn't demonstrate that. But what the record does demonstrate is that the number of units that were dropped were responsive to issues related to the Pacific Crest National Trail. If there are no more questions, I'll try and save some time for a bow. Thank you. Thank you. Good morning, Your Honors. Nicholas Demasio on behalf of the United States Bureau of Land Management. The Bureau of Land Management will be using 10 minutes of our argument time this morning, and counsel for interveners, Mr. Michael Hagelin, will be using 5 minutes of that time. I'd like to just start off by immediately addressing this no new roads alternative issue, which was a lot of time was spent on in the opening argument. And to clarify, BLM's rationale on this was simply that if BLM had to consider absolutely building absolutely no new roads in this area, what that would mean is that units that needed thinning couldn't be thinned because it would become uneconomical. The only way to access those units would be to do something known as helicopter yarding. And that simply would have been so expensive that the yield from those specific units wouldn't have justified the means to get at those units. Okay? So the mere fact that at the end of the day, BLM decided not to harvest one of those for which it needed to build a road does not undermine the rationale that BLM gave for the unit that still remained a part of the project. Why not? Why doesn't that make it illogical? Because it's not explained. I mean, it's just kind of it's interesting that in the end, they allow for less amount of land in the project. And the reason that they gave doesn't seem to support it because of this. I mean, if I'm correct, the initial proposal included 1,108 acres, correct, Mr. DeBlasio? Yes, I believe that's correct. All right. And the final plan included only 725 acres, correct? Correct. All right. And both the initial proposal and the final plan are consistent with the goal of a sustainable timber harvest? That's correct. In BLM's judgment, that's what was necessary in this project to achieve a sustained yield of timber. If you exclude units 28-3, 20-1, and 20-2 from the no-road alternative, that still leaves the potential for 981 acres. And I guess we're just left with the question of is 981 acres consistent with the goal of a sustainable timber harvest? I think the misunderstanding here is that the rationale doesn't apply to the overall economic viability of the project as a whole. But that's what you said. No. That's incorrect. What the BLM said is that if you look at the economic cost of accessing these particular units, if we couldn't access these particular units via road, we would have to drop them because the cost of accessing those units would be too high. That doesn't mean that the overall project would become economically unviable. This goes back to what I think Judge Kristin said, which is that plaintiff's argument assumes that all of these units are simply fungible. And that's not the way BLM looked at this. What they said is ---- Where is that explained in the environmental assessment? It's explained at Excerpt of Record 291, where they give the economic analysis where they say for the units that require road access, here's what it would cost if we had to drop the roads. And since that cost would be too prohibitive, it would simply mean that we couldn't harvest units that we in our judgment have determined to need thinning. And so we're not going to consider that alternative. Now, they ultimately drop one of the units, but they keep one of the units as a part of the project. Now, the rationale still applies as to the unit that they kept. That unit still couldn't be economically accessed if there weren't road construction. There's two, right? Two units, 20-1 and 20-2, remain in the plan, just to make sure that I'm understanding? I'm sorry. I believe I misspoke. That's ---- I believe that's correct. Well, pardon my interruption. I might need to get back to answering Judge Mergia's question. I just wanted to make sure I was following it. So please continue. Okay. So the fundamental misconception here is that the economic analysis that's on page 291 applies to the units that are being analyzed there. It's not a project-wide analysis of if we couldn't construct roads, this entire project would become unfeasible. It pertains to the units that BLM in its judgment has said, these particular units definitely need thinning. The only way that we can access them economically is via roads. You're asking us to not build any roads. If we build no roads, we simply can't access these particular units, which we've decided need to be thinned because they're overly dense. And one of the purposes of this project is to achieve a sustained yield of timber production by improving the health of the forest. If we can't access these units, they're going to remain unhealthy and overly dense, and therefore we're rejecting your alternative. Another point here is that one of the purposes of the project was specifically to develop and maintain a road transportation system to be able to manage the forest. And although it's true that BLM didn't specifically mention that on page 291, they did discuss that purpose of the project on page excerpt of record, page 249. And so their simple ---- But did they do it under the section? I don't believe so, Your Honor. I think that this ---- I thought that that was the whole reason for having those sections, to put the explanation in the proper place. I think there's some reference to some cases that says if it's not there, it's problematic. Well, you're correct. But on the face of the EA, it's certainly apparent that one of the reasons for the project was to develop and maintain a transportation network to achieve a sustained yield of timber products in the area. And even if BLM, you know, their decision could have been perhaps worded a little more So are you saying you did consider it in the EA, or you didn't need to consider it in the EA? They did consider it, to the extent that, you know, they explain on page 291. What they're saying is that we don't need to consider it in further detail. In other words, we don't need to incorporate this no roads alternative throughout the entire EA. Even though, I mean, in the end, what ---- I'm just trying to ---- understand this EA here. And it seems like you're getting a lot less timber, but still building a road. And I'm just left with the question, why is 700 acres and a road a consistent or is it consistent with the sustainable goal, but $900 and no road, not? You know, ultimately, I think it's within the agency's discretion to determine which units need to be thinned and which units don't. This is a scientific judgment on behalf of the agency where they evaluate through a very lengthy process which portions of the forest are overly dense and need to be thinned and which portions maybe can be left to another day. And it was ultimately a part of the agency's considered scientific discretion to say, these units need to be thinned right now because they're the ones that require our attention. And the only issue I have, and you need to tell me if this is significant or not, but, you know, your explanation that, you know, BLM needed to harvest 20-1 and 20-2 doesn't seem to be supported in the EA. The EA never goes unit by unit. If the EA had said what you're saying now, I think maybe you wouldn't have this issue. But I think on 290, 291, those pages say the need of 20-1 and 20-2 because the BLM needs 20-1 and 20-2 because that is necessary for sustainable yield. That's correct. In terms of these units needed to be accessed and thinned in order to promote a sustained yield of timber production from those particular units. Let me just add, there's another reason why this no roads alternative is inconsequential here, and that's because in their opening brief the plaintiffs explain that the whole reason why they've raised this alternative is due to concerns over sedimentation and water quality. There is not a single argument on appeal here that concerns impacts to sedimentation and water quality. Plaintiffs have not explained why the agencies considered decision in its EA that even if it did build these roads, in fact, the 1.9 miles originally considered, which was ultimately reduced to 1.15, but the EA looked at the consequences to sedimentation and water quality of building 1.9 miles of roads versus building no roads whatsoever. Okay. So this was a comparison of the no action alternative to the action alternative, which was 1.9 miles. Okay. So effectively, the agency did consider the no roads alternative as to water quality and sedimentation, and concluded that there would be no significant impacts from the project. The plaintiffs simply have not challenged any of that analysis. So this no new roads alternative is simply a red herring. It has no ultimate impact on the agency's decision here, and we are relying on this Court's decision in the Earth Island case, which said that where an agency's decision shows that the alternatives that it did consider show that a project will not have a significant impact on the environment, it simply does not make sense to fault the agency for not considering an even more environmentally protective alternative. Just a couple questions. The environmental assessment states that without a new road, three units could not have been harvested. And even if that's true, why was it necessary to harvest those three units? I mean, it seems like you're saying that those in particular needed to be thinned. It's not clear from the EA. You're making that statement here today. I'm trying to still figure out why BLM did not consider an alternative that did not harvest those units in light of the proposed suggestion by the Soda Mountain people. I think the clearest explanation of this, and admittedly there isn't a targeted discussion of the present conditions of the particular units that you're looking at on page 291, okay, but where I would urge Your Honors to take a look at this issue is at the silvicultural section of the EA, which goes through and explains the reasons why BLM chose to thin the areas that it's choosing to thin, which is that these are overly dense stands that need to be thinned for the health of the forest in order to support a sustained yield of timber. And if that explanation didn't need to be within the section, that would have answered the question right up front? I don't think so, because the standard under the APA is that even if an agency explains its decision with less-than-ideal clarity, this Court must affirm if it can reasonably discern the agency's path. What's your best case for that? I do not have that at my fingertips, but I can get it out of our brief. The Alaska Department of Environmental Conservation v. EPA case, that's a 2004 Supreme Court case, 540 U.S., 461. The pin site is 496, and it says, even where an agency explains its decision with less-than-ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may be reasonably discerned. And how about, let's assume that the rejection of the no-road alternative was arbitrary and capricious. Is there a way that you can still prevail? Yes, there is. First off, I think as Plaintiff's counsel is correctly explaining, injunctions need to be narrowly tailored. So at most, what you would be looking at is an injunction, a preliminary injunction of those units of the project that required road construction. But I would actually point out that in addition, at most, I think that what we're talking about here is a serious question as to the no-roads alternative. They're not showing that they have a likelihood of success on that issue, but simply that there may be a serious question. And if they show a serious question as to some aspect of the agency's analysis, they then would need to show that the equities tip sharply in their favor in order to be entitled to an injunction. But I'm trying to look at that on top of the NEPA framework, which focuses on the procedure here and the importance of the procedure, and whether or not, you know, how does it affect it if this alternative needed to be given a real hard look and it's determined that it wasn't because it was in a different section and they didn't directly address it. It seems like that's, you know, a wild wilderness case that just came out. Our precedent here may support that we have to look at that. At the same time, we're looking at the fact that this is a preliminary injunction, and I'm trying to figure out what we would do, especially with the fact that at the district court there's ongoing proceedings going on on the permanent injunction. So there's no possibility that at the end of this appeal there's going to be some kind of remand to the agency, because we're here on a preliminary injunction appeal. So the most that would happen would be some kind of narrow injunction of some portion of the project that had to do with the roads. In terms of the NEPA context, I think maybe what the confusion here is, is that the only consequence of this decision would be we're talking here about an analysis that you're saying allegedly may be deficient in an environmental assessment. Okay? And so if what you're saying is that the agency should have considered a no-roads alternative, at most I think that would mean that the agency would have to go back and as part of its EA consider whether or not any roads should be built or not. So it would simply be a remand to look at that issue in further detail in the environmental assessment. Remand, or I guess is this not right for mediation in light of the issues that have come out on the no-road alternative? I don't think so. In particular, I think that because of the progress in the district court on the merits, you know, this is a case that's already gone through full briefing on the merits. And so the preliminary injunction appeal would then be over, and perhaps some kind of talks could take place in district court. Well, it doesn't matter to me if it's at the district court or at the circuit court level, but it just seems that there may be an issue here that it looks like both parties may be open to resolve with respect to these potential units. And it seems like both of you are in agreement that the only thing that might be affected if there is a problem with the no-roads alternative would be these units and the rest of the plan could proceed. At least that's what my sense was from your opposing counsel. Is that true for you, too? If, assuming that the agency's analysis of the no-roads alternative was deficient, then, yes, we agree that the scope of the injunction would only reach those units that needed to be accessed via road. But we disagree that there was any flaw in the agency's analysis. You just said via road. We're talking about just the new road, the 1.15? Via the new road, yes. Okay. So a minute ago you said road. So you're talking about just the 1.15 of new road? That's correct. Forgive me for interrupting, but that's an important point. Thank you. Yes. So I just want to be clear, though, that we disagree that there was any flaw in the agency's analysis. We also disagree that there's any consequence to the environmental impacts of this  And so Your Honors should deny the preliminary injunction. I'm well over my time here, but I — if — with your permission, I would like to just briefly make the point that I began to make a few minutes ago, which is that even if there were some serious question as to the roads alternative, you would then need to find that the equities tip sharply in the plaintiff's favor in order to issue an injunction here. And this project, there is absolutely no challenge to the fact that this project is intended to benefit a currently unhealthy, disease-ridden, and predisposed-to-catastrophic fire area of the forest. These thinning treatments would help improve the health and fire resiliency of the forest, and they would further the intention of Congress in the Oregon and Coastal And against all of those legitimate concerns, the only thing that we're hearing from the plaintiff's side is that they have a short-term interest in maintaining the area in its currently unhealthy state. I would submit that even if there were a serious question as to some small aspect of BLM's analysis, that the equities in this case favor allowing the project to go forward, and so a preliminary injunction would not be warranted. And again, we're here on an abuse of discretion standard, and the district court did not abuse its discretion in weighing those equities. May it please the Court, Mike Hagelin for Defendant Intervenor Murphy Company, which is the company that purchased the timber sale and was began harvesting last fall. I'd like to make three quick points. First, the out-on-the-ground view is extremely helpful in this case, and that's what Judge Panner had the benefit of multiple declarations, including one from Randy Zustiak, which is in the record at Intervenor Supplemental Excerpt, page 12. That is a place where you can actually see photographs from Units 20-1 and 20-2, which are completely consistent with this whole operation. The entire thrust of this timber sale is to go out and thin approximately 10 to 15 percent of the stems out there, the small generally and almost exclusively the small trees, which are crowding the old growth. Those pictures reveal that the trees being left are the beautiful legacy ponderosa pine, incense cedar, some Douglas fir. It's the small white fir and small Douglas fir that are being removed. The habitat quality for the fissure in the northern spotted owl is ultimately enhanced. The other important kind of on-the-ground aspect of this are the visual stand simulation photos, or not photos, they're depictions that you find in the record beginning at ER 362, where the government, BLM, has a stand density index that shows that these large trees, because of this intense crowding, are actually in the process of dying, and that they actually show in these depictions what it will look like immediately after harvest and what it will look like in 50 years, and then what the different stand density index changes, and these larger trees resume a vigorous, healthy level of growth. This is a timber sale that really should be viewed as one of the best possible approaches that the government can take here. How is it that the smaller trees deprive nourishment to the big trees that have been there? Deprive nourishment, did you say, Your Honor? It's a function of the crowding. If they're in close proximity to the large trees, they are competing for the water and the nutrients from the soil, and that is causing the larger trees to lose vigor in that effort to compete with the smaller trees. Once you remove them, increase the level of light, the photosynthetic area of the crowns, the crowns are also diminished throughout this forest. Those crowns will rebound, and the photosynthesis will take over, and the trees will be much healthier. The bottom line here is if you look at each of their arguments on behalf of the plaintiffs, they really reflect not a failure of the NEPA process or a substantive violation of FLIPMA, but a disagreement with BLM's policy choice or judgment call on science. And those are not issues that the government should lose on in the context of a NEPA case like this one. The government especially is entitled to deference in matters of science, which there is abundant science to support the decisions that they've made. The last point that I'd like to make is that there was some harvesting that went on last fall. The plaintiffs in the run-up to this argument moved for an emergency injunction and secured one on a two-to-one vote that I believe was from a panel. We have very recently filed a motion to clarify that injunction, and it's unopposed by the plaintiffs, that the trees and logs that are down from late last fall when the rains came and operations had to cease should be able to be removed. There are dozens of cases in this circuit in the past 20 years where down logs are allowed to be removed because of the deterioration that occurs, and now that we're into the hot weather, even in Oregon, those white fir predominantly are going to check, crack, and the value to the plywood that these logs would ultimately go into is going to deteriorate. So I would urge the panel. Cut and you're worried about waste. Correct. We'd urge the panel to, consistent with the lack of opposition, simply issue a one-line order clarifying that the injunction does not reach going in and sending those logs to the veneer plant in Medford where they'll be peeled into veneer. This case is on a P.I. abusive discretion standard. We're nearly at the end of the merits. The magistrate judge recommended granting the United States and intervenors motion for summary judgment. It's now before Judge Panner on those findings and recommendations to consider plaintiff's objections. Our brief is due in two days. On that, I would expect that Judge Panner will be ruling on the merits sometime in the next 30 to 40 days. I urge you to lift the injunction or clarify the pending emergency injunction and affirm Judge Panner's decision in the district court. Thank you. Thank you. Just to respond quickly to a couple of things, I think the issue that Judge Marghia was getting at is some of the post hoc rationalization issue. And I think the best example of that, at least in the briefing, is SEC v. Chainery, U.S. Supreme Court decision. And I'll just do a small quote here from that. I believe the Supreme Court in that case called that a simple but fundamental rule of administrative law. And in this case, the specific rationale invoked with regard to the no roads alternative was just simply this uneconomical, unsustainable. I'm going to read that again slowly because this part of it. Sure. A reviewing court must judge the propriety of such actions solely by the grounds invoked by the agency. And prior to that quote, the Supreme Court called that rule a simple but fundamental rule of administrative law. The second issue, our no roads alternative, is not just simply tied to sedimentation and so forth. As the BLM at excerpts of record 343 in the environmental assessment stated, some of this road construction will remove existing forest and contribute to the fragmentation of habitat used by the fisher. So it's just simply not roads have multiple impacts, not just on hydrology. But, again, this claim is kind of our hydrology claim, simply because we're not arguing other claims related to hydrology should not, the court should not dismiss this claim for that reason. Counsel for the BLM spoke of the equities. In this case, the district court judge simply did not invoke a single equity that favored an injunction. Why does the balance of equities tip sharply in your client's favor? Because of the issue of irreparable harm. Unfortunately, I haven't been able to get to that yet in this case. Irreparable harm generally supersedes economic harm in these types of cases. It's not just economic harm. There are many purposes to this project, including preserving the forest and protecting it from fire. That is correct, Your Honor. And to the degree that counsel for BLM or intervenors stated that we agree that the forest is extremely unhealthy, we do disagree. But I did ask you that, counsel, right at the top. I asked you the, I think it was my, one of my first or second questions. Did you ever argue that there should be no action? Do you dispute that this forest is unhealthy? And I understood you to clearly say the contrary to what you're telling me right now. I think it's correct saying that my clients didn't argue in favor of the no-action alternative. The no-action alternative is, I've never seen a case in my, I've never. Forest unhealthy? Is your client arguing that they shouldn't go in and thin this forest? To broadly say that the entire forest is unhealthy is a. . . I'm talking about the project side. Excuse me. The entire project area is unhealthy. My clients would not agree with that. Forests are dynamic areas that you can't, these units 20-1, 20-2, my clients have stated in their record and their declarations that it's very much representative of a classic old growth forest. So you don't think this forest needs to be thinned? There may be portions, there may be units that that might be a correct notion, but in other units it may not. I mean. . . Did you ever argue that below? That portions of the project may. . . Don't need to be thinned? It's generally the basis of our case. That much of. . . No thinning needs to be done? I don't think it's as black and white as no thinning and thinning. There are perhaps areas in the forest that might be overcrowded. The issues that we've been focusing on here, 20-1, 20-2, I don't think that that is the case. I think one aspect of this is that Pacific Fisher, something that has been extirpated from Washington and believed to be extirpated from northern Oregon and is imperiled in Oregon, that's its status, is now found in this project area, and that's. . . I'm not sure this is your strongest argument, counsel, but. . . I understand that a single siding is relatively significant given the lack of sidings of this creature in quite some time. Well, but you're not arguing that BLM failed to consider habitat for the Pacific Fisher. Their argument, their position is that this would enhance the habitat for the Pacific Fisher. That is a correct assumption. That's a correct characterization of their argument, but at the same time, the quote that I just said, that constructing these roads fragments the Fisher's habitat. That contributes to the need to list this species. That goes back to the 1.15 of a new road? Because you're not contesting the use of the old roads. Correct. That is very much correct. I mean, they have to use the existing roads. It's 1.15 new permanent roads, and there's 0.6 of temporary roads that are. . . I appreciate the correction. Thank you. And then, again, the final point here is the Fish and Wildlife Service and the BLM acknowledge that timber harvest, fuels reduction, road construction, all of these things do adversely impact these species. And with that, plaintiffs would ask that the panel reverse the district court's decision to deny the preliminary injunction. All right. Thank you. The matter is submitted, and the court will recess until 9 a.m. tomorrow morning.
judges: Pregerson, Murguia, Christen